UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

KEVIN TOULAN; administrator of
the Estate of Bridgett Toulan,
deceased

Plaintiff

v.

CUMBERLAND COUNTY;
AAG JILL O'BRIEN;
JOHNATHON BOLTON;
CUMBERLAND SHERIFF'S
OFFICE;
ARMOR CORRECTIONAL
HEALTH SERVICES, INC.;
LPN CHERYL KIRK; EDIE
WOODWARD, PA; C/O FRED
ROZZIE; C/O MATTHEW SMITH;
JOHN AND JANE DOE PRISON
AND MEDICAL STAFF 1-10.

Defendants.

Complaint
(Jury Trial Demanded)

## Complaint

NOW COMES the Plaintiff, Kevin Toulan, ("Kevin" or "Plaintiff")

administrator of the estate of Brigitt Toulan, deceased, through his

undersigned counsel, and hereby states the following as his Civil Rights

Complaint against the Defendants, AAG Jill O'Brien; Cumberland

County/Cumberland County Sherriff's Department (CCSD), Armor

Correctional Health Services, Inc.; (Armor) Lpn Cheryl Kirk ("Kirk"); Edie

Woodward, Pa ("Woodward"); C/O Fred Rozzie; C/O Matthew Smith; and

John And Jane Doe Prison And Medical Staff 1-10.

Plaintiff offers in support of this Complaint the attached and referenced

Exhibits and incorporates their contents by reference. The Exhibits include

dash cam and prison surveillance video obtained through Plaintiff's civil action

against Cumberland County Sherriff's Department for violation of Maine's

Freedom of Access Act (FOAA). *See* Toulan v. Cumberland County et. al.

Docket No. 2025-00192. Plaintiff filed his FOAA Complaint on June 12, 2025

and it remains pending.

### Introduction to Plaintiff's Section 1983 Civil Rights Action for Constitutionally Inadequate Medical Care and Deprivation of Access to Courts.

Bridgett Toulan ("Bridgett") tragically died sometime between 8:41

p.m. on April 9, 2024 and 5:50 a.m. on April 10, 2024 while she was a pre-

trial detainee in the custody of the Cumberland County Sheriff's Department.

Her death was the second at County jail in less than a month. Darren Laney

Jr., 37, was found unresponsive in his cell on March 22, 2024.

Bridgett died because corrections officers and privately contracted

medical staff ***deliberately ignored her for over 9 hours,*** leaving her to

suffer and die in her cell. Records and video indicate that Defendants

2

knew Bridgett from prior encounters to be "a heavy drug user" who was homeless and battling addiction. An Internal Affairs Investigation Report ("The Derr Report") states that prison medical staff placed Bridgett "on COWS (Clinical Opiate Withdrawal Scale) Monitoring and Low bunk/Seizure precautions" which meant that she should have been placed in special detox housing while at the jail. *See* Ex. 1 – Derr Report. But instead, prison staff deliberately placed Bridgett in "general population" which made their workload easier because it did not require staff to assess Bridgett every 15 minutes. *See* Ex. 2 – Amor Health Medical records. Per their own policy, prison staff should have, at a minimum, ***made sure she was breathing***. *See* Ex. 3 – Medical Policy. But 9 hours passed before anyone noticed Bridgett *wasn't* breathing.[1] That Defendants deliberately ignored Bridgett is evidenced by surveillance video showing officers nonchalantly walking by her cell without inspection throughout the night, completely oblivious to her dead body.[2]

Prison staff finally realized Bridgett was dead when they opened her cell door to give her breakfast. According to reports, staff found "her mouth and eyes slightly open; her face was gray [with no sign] of breathing. She was stiff."

---

[1] The last time any staff member checked to see if Bridgett was alive and breathing was at approximately 8:35 p.m. on April 9th. She was found dead at 5:50 a.m. on April 10, 2024.

[2] The cell doors are opaque wood with a small window. The detainee's bed cannot be visualized in any meaningful way from the window. Stated differently, without entering the cell, rounding officers cannot determine if an inmate is breathing or in distress while lying in bed.

Her blanket was covered "in vomit." Id. *See* Ex. 1. Photos show a ***dried*** puddle of green vomit beneath Bridgett's bunk with her blanket stuck to it. *See* cell photo, *Infra.*

Defendants provided none of the above information to Bridgett's son, Plaintiff, Kevin Toulan, nor his three siblings, upon Bridgett's death. Kevin tried to obtain records from the police department only to be given the "run around." Kevin retained the undersigned to get answers, some of which came after he filed a court complaint for violation of Maine's Freedom of Access Act. But Defendants have continued to withhold information, particularly the Attorney General's office and Department of Corrections, which refuses to provide Plaintiff with a copy of its report on Bridgett's death in violation of Maine's Freedom of Information Act, 1 M.R.S.A. §401.[3]

## Parties

---

[3] "AG protocol investigation of death:
C. Death while in custody or confinement 1. Jail, Holding Facility, Correctional Institution. The death or probable death of an individual while in custody or confinement in a jail, holding facility, or correctional institution, regardless of the likely cause, manner, and circumstances, is to be reported immediately to the Office of Chief Medical Examiner, the appropriate MCU, and the Operations Division of the Department of Corrections. These notifications are necessary for these agencies to carry out their responsibility of investigating the death to determine the cause, manner, and circumstances of death. The Operations Division of the Department of Corrections is responsible for conducting an investigation into the operational practices, policies, and procedures ***to determine compliance with required standards."*** [emphasis added]

1.    Plaintiff Kevin Toulan ("Kevin") is Bridgett Toulan's son and administrator of her estate. Mr. Toulan's address is 3250 Crump Rd., Winter Haven, FL 33881.

2.    Defendants, Cumberland Sheriff's Department and Cumberland County, are Maine State Agencies or Municipal entities that at all relevant times maintained, controlled, oversaw, administered the Cumberland County Jail.  They also were responsible for training the individual defendants, creating standard operating procedures and making policy decisions relative to the jail. Both were responsible for ensuring adequate staffing at the jail.

3.    Jill O'Brian is an Assistant Maine Attorney General (AAG) and was responsible for responding to Plaintiff's FOAA request directed to the AG's office. On Ms. O'Brian told Plaintiff's counsel that she would produce a copy of the AG's report evaluating the Cumberland County's Jail's compliance with required standards relative to Bridgett Toulan's death. But O'Brian later refused to produce the report because "[Plaintiff's Complaint for violation of the FOAA] *Toulan v. Cumberland County* No. 2025-00192 makes allegations against Maine Department of Corrections that the MDOC believes are inaccurate."

4.    Armor Correctional Health Services, Inc. (Amor) is a Florida Corporation doing business in the state of Maine with a principal place of business at 4960 SW 72 Avenue, Suite 400, Miami, Florida 33155. Armor was

responsible for medical evaluation and care at Cumberland County Jail, and contractually required to train the individual corrections officers and medical staff at all times relevant to this action.

5.    Cheryl Kirk was at all relevant times a licensed practical nurse and Armor employee. Ms. Kirk was responsible for performing Bridgett Toulan's initial intake screening and placing her in general population. She was also responsible for Bridgett Toulan's medical care, monitoring and treatment.

6.    Edie Woodward was at all relevant times a licensed physician's assistant and Armor employee. She was responsible for Bridgett Toulan's medical care, monitoring and treatment along with Kirk. Woodward agreed and approved of Bridgett's placement in general population.

7.    Fred Rozzie was at all relevant times a corrections officer (C/O Rozzie) at Cumberland County jail and was working the night of Bridgett's death. He was required to make sure that Bridgett was breathing and not medically compromised during his shift.

8.    Michael Smith was at all relevant times a corrections officer (C/O Smith) at the Cumberland County jail and was working the night of Bridgett's death.

9.    John And Jane Doe Prison Staff and Medical Staff 1-10 were at relevant times employed by the County or Amor Health and were responsible for Bridgett Toulan's medical care, monitoring and treatment.

## Jury Trial Demand

10.    Plaintiff demands trial by jury on all issues triable by a jury.

## Jurisdiction and Venue

11.    This action arises under 42 U.S.C. § 1983

12.    This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

13.    Venue is proper in the Maine Federal District Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Cumberland County, Maine.

## Facts

A.    **Bridgett is arrested; Defendants Deliberately Place her in "General Population" Instead of the "Detoxification Unit"; Defendants Ignore Bridgget for 9 hours and Find Her Dead in Her Cell at 5:50 a.m.**

14.    On April 08, 2024, at approximately 6:53 p.m. Portland Police Officer Curran Huff was on routine patrol in a marked police vehicle when he alleges that he "recognized" Bridgett Toulan in the passenger seat of moving vehicle. He claims that he knew from memory that she had an outstanding

7

warrant. Officer Huff's dash camera video did record his initial "recognition" of Bridgget but instead shows him making a left turn and stopping behind a vehicle in which Bridgett was a passenger.

15.     Officer Curran arrested Bridgett along with two other women who were in the back seat of the stopped vehicle. Curran released the male driver with a citation for drug possession.

16.     Curran's arrest report does not indicate that Bridgett was suffering from an acute drug overdose, directly contradicting the Maine State Medical Examiner's report, which states that she died from "*acute* intoxication*.*"

17.     Video from inside Huff's cruiser shows Bridgett sitting quietly with her hands cuffed behind her back for over *an hour and a half*.

18.     Curran transported Bridgett to Cumberland County Jail where she was booked for parole violation and possession of "cocaine base."

19.     When Curren arrives at the jail, he radios to staff that he has a detainee and a response is heard on the video saying "we're full."

20.     While Bridgget is still handcuffed in the back seat, a female prison staff member can be heard asking general health intake questions. When asked if she had any "medical issues," Bridgett responds, "yes, I have [a lot of] medical issues. I just got out of the hospital for liver disease." Bridgett was still wearing her Maine Medical Center ER bracelet.

21.     Cumberland Prison has designated "Detox" cells (B Side Cells/De-Tox cell No. 228, 229). Detainees suffering from withdrawal are required to be housed in these cells so that staff know that heighted monitoring at shorter time intervals is required.[4]

22.     The IA report states, "during her intake medical screening Toulan tested positive for amphetamine, methamphetamine, cocaine, and fentanyl. She disclosed a history of epilepsy/seizures, back/neck problems, and Hepatitis B. She was placed on COWS (Clinical Opiate Withdrawal Scale) Monitoring and Low bunk/Seizure precautions." *See* Ex. 1 – M. Derr Investigation report.

23.     Amor Health prison intake records state that Bridgett "used t5 mg of heroine daily."

24.     But Bridgett was not placed in detox cell 228 or 229; rather, she was placed in "general population." And records show that she was ***not*** monitored whatsoever.

25.     Specifically, the IA report states that "the last time prison staff saw Bridgett alive was at 8:35 p.m. at which time Correctional Officer

---

[4] Defendant's procedure states, "1. B Side Cells/De-Tox cell (228, 229) Checks The officer doing the cell checks will also do the log entries. The meaning of a cell check is the officer will physically walk to the cell(s) with the inmate(s) in it. That check will include but is not limited to respiratory status (breathing) and the inmate well-being. The 15 minute checks will be required whether the inmate is standing or lying down."

Mathew Smith "asked I/M Toulan *if she would like* to see the nurse for detox rounds. She agreed to come out, saw the nurse, and then returned to her cell."

26.     But surveillance video does not show CO Smith speaking to Bridgett. And although the video does show Bridgett shuffling out of her cell around 8:41 p.m. on April 9th, the alleged "detox check" is nothing more than a blood pressure reading and distribution of a sports drink.

27.     Over the course of the next 9 hours, surveillance video shows C/Os Smith and Rozzi staring at what appears to be their personal laptops for long stretches of time, like they were watching a movie. They circle the perimeter of Bridgett's cell block every 30-40 minutes, passing by each cell in *under one second* while occasionally cocking their heads near cell windows presumably so that they appear engaged. Neither Smith nor Rozzi *ever* enter a cell to check on a detainee.

28.     Over 9 hours later, at 5:50 a.m. on April 10, 2024, CO Rozzi finally opened Bridgett's cell door to inquire if she wanted breakfast and found Bridgett dead.

29.     All of the evidence suggests that Bridgett had been dead for many hours while CO's Smith and Rozzi performed "security checks" on detainees every 30-40 minutes. Photos and reports state her body suffered from severe rigor which begins 2 to 4 hours after death. She was found laying

on her back, and photos show that all of her blood had "settled" (liver mortis) posteriorly. This takes about 6 hours. As one lieutenant described, "I entered the housing unit and followed Officer Rozzi to cell 128. I entered the cell and saw that inmate Bridgett Toulan (602444) was on her back. Her mouth was sightly open and her eyes were open sightly; Her face was gray and I did not see any sign of breathing. I tried to move her leg and found that she was stiff."





30.     By extension, it is patently clear that COs Smith and Rozzie deliberately made no effort to determine whether Bridgett was breathing during their shifts, much less whether she was vomiting or in some other distress related to withdrawal.

31.     Defendants' policy states that "if a death occurs within the Cumberland County Jail, whether accidental or deliberate, Corrections personnel shall preserve the scene; notify the proper authorities; thoroughly investigate the incident; Notify the next of kin as soon as possible and complete reporting requirement."

32.     The Cumberland County Sheriff's Office was required to report to the jail, consult with scene officers and conduct a briefing, interview witnesses and, importantly, preserve all reports, statements, documentation, and field notes.

33.     Thereafter, the Defendants were required to record an accurate account of the situation and procedures carried out in the facility log and the Administrative Investigations Division must submit a written report to the Sheriff.

34.     Finally, Maine attorney general guidelines state that the "Operations Division of the Department of Corrections is responsible for conducting an investigation into the operational practices, policies, and

procedures *to determine compliance with required standards*.  The Attorney

General's Office will thereafter review all investigative results."

### B. Defendants Continue to Violate Maine's FOAA Act and Withhold Records Necessary for Plaintiff's Fair Access to Court.

35.  On February 11, 2025, Plaintiff, Kevin Toulan, spoke with

Defendant, Portland police department via telephone to request records

related to his mother, Bridgett's arrest, detention and death. He spoke an

individual named Teressa for approximately 10 minutes, who refused to give

Kevin a copy of the police records through mail because the report was "in his

[deceased] mother's name and therefore he needed to show proof of

relationship. Teresa advised that the most efficient way to obtain the

requested records was for Kevin to "come in person," and that he would then

have the records the same day or at the latest 3-5 days. Kevin resides in

Florida. Nevertheless, he booked a flight to Maine that day.

36.  On February 14, 2025, Kevin went to 109 Middle St, Portland,

Maine and spoke with Teressa, who provided Kevin with a form to fill out for

the records. Theresa asked for his ID and Birth Certificate to verify that he

was Bridgett's son. After all paperwork was completed and proof of

relationship was provided, Kevin asked for the documents/report and Theresa

told him that "since his mother is dead, the investigators need 3-5 days to

review their report with detectives before giving it to him."

37.    Ten Days after completing the "request for incident report" paperwork, but the defendants still did not provide Kevin with any the requested documents. Kevin contacted the Portland Police Department via phone from Florida and spoke with someone named Megan who advised that she worked with Teresa. Megan advised that she couldn't find Kevin's report request in their system. And that they submitted Kevin's birth certificate and id a 2nd time, but that it was "on hold" and would now take up to an additional 5-7 days to legally verify Kevin as his mother's child. Megan then said that it was "a mistake on their end."

38.    On March 10, 2025, Kevin spoke with Teressa again and asked why he still had received no reports or other documentation. Teressa put Kevin on hold and then said that the PPD "cannot give him the police report until investigators verify his identity and relation to his mother, and not until the Detectives are done reviewing the report because it involves a dead person."  She told him to call back in a week for an update.

39.    Finally, on March 21, 2025, the PPD mailed Kevin one of two reports. (The PPD told him there was a second report that was still "under review"). The second report was never provided.

40.    The first report was mailed to Kevin with no cover letter and nothing explaining why much of the report was redacted.

41.    Meanwhile, on February 12, 2025, Mr. Toulan's undersigned attorney filed multiple Freedom of Access requests on Kevin's behalf with the following government agencies: Cumberland County Sheriff's Office, Portland Police Department, Department of Corrections, Chief Medical Examiner and Armor Health (which provided medical care at the jail).

42.    The FOAA requests stated:

"We represent Kevin Toulan in connection with the death of his mother, Bridgett Toulan, (DOB 6/3/76) while she was in custody at the Cumberland County Jail (arrest No. 325333) from April 8, 2024, until her death on or before April 10, 2024. *We are writing to request any and all records related to Bridgett Toulan's arrest and incarceration.* Pursuant to the Maine Freedom of Access Act, 1 MRSA §§400, et seq., we hereby request copies of the following materials: 1. *All photographs, videos, and audio recordings*. 2. Autopsy reports, arrest records, investigation documents, and correctional officer reports. 3. Official police and prison policies regarding medical care, prisoner intake, monitoring, staffing, and attendance records at Cumberland County Jail from April 7, 2024, to April 10, 2024. 4. Reports on the use of force, prison medical records, and psychological treatment and care. Please keep in mind when responding to this request that we represent the victim's son in an incident and the materials obtained will be used in the pursuit of potential civil claims he may have as a result of the incident."

43.    All of the above agencies ignored Plaintiff's FOAA requests or provided no records whatsoever except one. On February 18, 2025, Steven Pyles contacted Plaintiff's counsel and asked for clarification of the documents sought. Plaintiff's counsel responded via email with the following:

"Dear Mr. Pyles,

Thank you for your letter. To clarify, We represent Kevin Toulan in connection with the death of his mother, Bridgett Toulan, (DOB 6/3/76) while she was in custody at the Cumberland County Jail (arrest No. 325333) from

16

April 8, 2024, until her death on or before April 10, 2024. We are writing to request any and all records related to Bridgett Toulan's arrest and incarceration. Pursuant to the Maine Freedom of Access Act, 1 MRSA §§400, et seq., we hereby request copies of the following materials:

1. All photographs, videos, and audio recordings.
2. Autopsy reports, arrest records, investigation documents, and correctional officer reports.
3. All Official prison/jail policies covering pre-trial detainee and inmate medical care, new detainee/prisoner medical screening, new detainee/prisoner psychological evaluation, emergency medical response, prisoner monitoring, suicide prevention and new prisoner intake and cell placement.
4. Staffing records for Cumberland county jail from April 8, 2024 through April 10, 2024.
5. All reports, including incident reports, code blue reports, extraordinary occurrence reports, correction officer rounding reports, and any other reports prepared by the Cumberland county jail, its contractors, agents and staff related to Bridgett Toulan.

Please provide an estimated time for completion of this request. Thank you in advance,

Joe Guzzardo, Esq."

44.    On February 19, Pyles responded with an email attaching several documents that were largely unresponsive to Plaintiff's FOAA request. And no photos or videos were provided. Nor did Pyles provide any written objection or narrative explaining why many of the documents were withheld. His email attaching documents was instead a single sentence: "See Attached."

45.    On February 25, 2025, Plaintiff's counsel again emailed Pyles and demanded the missing documents as follows:

"Dear Mr. Pyles,

I reviewed the documents you provided and it appears that certain information was withheld or is missing from your response. Please provide the following records as previously requested.

1. Lt. Donald Mowatt stated that he collected "necessary Log Reports other documents and made three packets" which he provided to Captain Costello, Captain Frigon, and Administrative Investigator Derr. Please provide these documents.
2. Lt. Donald Mowatt stated that he "downloaded video footage from pod C3 cameras starting at 1800 04/09/2024 and ending at 0600 04/10/2024; made two copies of that video footage onto thumb drives and turned those over to Administrative Investigator Derr." Please provide these videos.
3. Sgt. Fowle stated that video recorded the prison staff going into and out of Bridgett Toulan's cell for 4 hours after she was found dead. Please provide this video.
4. Photographs of vomit taken by Lt. Foss
5. A signed copy of Internal Investigator Derr's report
6. The medical records that IA Investigator Derr attached to his report. You provided an unsigned report with no attachments.
7. IA Investigator Derr reviewed surveillance video footage from Pod C3 from 4/9/2024 at approximately 2:00 am through 4/10/2024 at approximately 6:00 am. Please provide this video."

46.    Pyles responded, stating,

"Hello,

The points on investigative and HIPAA related materials were addressed in previous responses, along with appropriate parties to contact.  To reiterate; if the Portland Police Department, the investigators on this incident, determine that certain materials come from us after they've been contacted, we will comply once notified."

47.    Plaintiff's counsel emailed Pyles in response as follows:

"There is no procedural mechanism under the Maine Freedom of Access Act permitting one municipal agency to withhold or deny records in its possession until another agency determines whether the former should produce the records. Your office did *not* deny my FOAA request; rather, it provided reports *in its possession* and withheld attachments to those reports that are also *in its possession*. And none of the requested records are protected by HIPPA. For example, I asked for a signed copy of the report you already provided. The investigator's "signature" has nothing to do with HIPPA. Neither does not video surveillance."

18

48.    Not to be deterred, on May 6, 2025, Plaintiff's counsel sent two

additional FOAA requests to the Portland Police Dept. and Cumberland

County Sherrif's office. The FOAAs requested the following:

"We hereby request copies of the following materials as referenced in
Investigator Marc Derr's "Law Report for Incident 24-010149" enclosed
herein for your convenience:
    1. Lt. Donald Mowatt stated that he collected "necessary Log Reports
other documents and made three packets" which he provided to Captain
Costello, Captain Frigon, and    Administrative Investigator Derr. Please
provide these documents.
    2. Lt. Donald Mowatt stated that he "downloaded video footage from
pod C3 cameras starting at 1800 04/09/2024 and ending at 0600 04/10/2024;
made two copies of that video footage onto thumb drives and turned those
over to Administrative Investigator Derr." Please provide these videos.
    3. Sgt. Fowle stated that video recorded the prison staff going into and
out of Bridgett Toulan's cell for 4 hours after she was found dead. Please
provide this video.
    4. Photographs of vomit taken by Lt. Foss
    5. A signed copy of Investigator Derr's report
    6. The medical records that IA Investigator Derr attached to his report.
Your office previously provided an unsigned report with no attachments.
    7. Investigator Derr reviewed surveillance video footage from Pod C3
from 4/9/2024 at approximately 2:00 am through 4/10/2024 at approximately
6:00 am. Please provide this video."

49.    Neither the PPD nor the CCSO provided any objection or

responsive documents/records. Plaintiff filed a Court Complaint for Violation

of Maine's FOAA on June 12, 2025, Docket No. 2025-00192. This action

remains pending.[5]

_____

[5] The PPD and Cumberland County did eventually provide some of the requested
records after Plaintiff filed suit; however, the Defendants in that action maintain

50.    On July 22, 2025, Plaintiff's served a FOAA request on the Public

Access officer of the Maine Attorney General's office, Johnathon Bolton.

Plaintiff's request sought the following:

Dear Mr. Bolton,

My office was retained by the family of Bridgett Toulan, (D.O.B. 6/3/1976; SSN: 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), who died while in custody at the Cumberland County Jail on or about April 10, 2024 (arrest No. 325333). I am writing to request a copy of the Department of Corrections Investigation Report and related documents regarding the unattended death of inmate Bridgett Toulan as required by the Maine attorney general's guidelines for inmate deaths. I request a copy of the Attorney General's review of the investigative results and any reports that the AG generated as a result of that review. The above documents are requested under the Maine Freedom of Access Act, 1 MRSA §§400, et seq.,

The public has a significant interest in "information that might document governmental efficiency or effectiveness … [and] information documenting governmental negligence or malfeasance." *Fairfield v. Maine State Police*, 2023 ME 12, ¶ 17, 288 A.3d 1220, 1226, as revised (Apr. 6, 2023). This is especially true in this instance because ANOTHER inmate, Daren Laney Jr., died the week prior at Cumberland County Jail.

Here, Ms. Toulan, a known chronic drug abuser, was arrested for drug possession. During her intake medical screening at the jail, Ms. Toulan tested positive for amphetamine, methamphetamine, cocaine, and fentanyl. She disclosed that she used 5 grams of heroin daily. Staff identified her as high risk for withdraw symptoms and placed her on COWS (Clinical Opiate Withdrawal Scale) Monitoring and Low bunk/Seizure precautions. The records obtained thus far indicate that Ms. Toulan was placed in general population instead of special detox cells. She was found dead on 4/10/24 only because an officer entered her cell to give her breakfast. Reports state, "At about 0550. Lt. Haskell responded to a medical ELIS in C3. [Haskell] entered the housing unit and followed Officer Rozzi to cell 128. [Haskell] entered the cell and saw that inmate Bridgett Toulan (602444) was on her back. Her mouth was sightly open, and her eyes were open sightly. Her face was gray, and [Haskell] did not see any sign of breathing. [Haskell] tried to move her leg and found that she was stiff."

---

that some of the requested records no longer exist or never existed. Plaintiff's state court action remains pending.

51.     After several back-and-forth emails regarding the Attorney

General's failure to produce any documents in response to the request, Bolton

responded on July 30, 2025 saying,

"Respectfully, there is no obligation under FOAA to provide an estimate or produce records within 5 business days of the request (even assuming that your request was received on 7/22 despite the fact that I cannot locate it in my email).  Rather, both the estimate and the final production must be within a "reasonable" time.  *See* 1 MRSA §408-A.

In any event, my understanding is that you made the same request of the Department of Corrections and it was denied, ***with an offer to assist you in seeking the report via a consented-to court order.***  I am ***therefore also denying your request*** for the same reasons, under 34-A MRS § 1216 and 16 MRS § 804. ***Rather than pursue unnecessary and costly litigation***, I encourage you to work with DOC to obtain the report." [Emphasis added].

52.     Thus, it is evident that Bolton discussed the matter with the

Department of Corrections and conspired with this individual to deny access

to the Attorney General's report on Bridgett's death. As detailed above, this is

the second time that officers in different government agencies discussed

Plaintiff's separate FOAA requests and worked together to deny access to

documents.

53.     As Bolton stated on July 30th, it is true that the Department of

Corrections, through its attorney, Jill O'Brien, agreed to produce the

requested Department of Corrections Investigation Report and a copy of the

Attorney General's report of its review of the DOC investigative results, *via a*

*joint application for a Court Order.  O'Brien offered to make the joint*

*application as an alternative to Plaintiff's filing a lawsuit.* According to

O'Brien, the DOC takes the position that it would disclose the DOC report to Bridgett Toulan if she were alive. But since Bridgett is deceased, the DOC will not provide its report to Bridgett's estate absent a Court Order.[6]

53.    However, Ms. O'Brien subsequently breached her own agreement and refused to enter and/or apply for a joint Order to produce the attorney general's report. Specifically, O'Brien stated, "*Given that your Complaint in Toulan v. Cumberland County makes allegations against MDOC* that you did not disclose to me when we discussed the matter last week[7] and that MDOC believes are inaccurate," [I will no longer agree to submit a joint application for the report][Emphasis added]. *See* Ex. 4 – O'Brien email string.

54.    Stated differently, O'Brien, collaborating with Bolton, deliberately obstructed Plaintiff's access to the Department of Corrections Investigation Report to hinder Plaintiff's civil rights allegations against the DOC and its employees.

## Legal Claims

## Count I

## Section 1983 Claim for Violation of the Eighth and Fourteenth Amendment[8]

---

[6] The DOC's stated interpretation of disclosure rules is obviously misguided and leads to an absurd result.

[7] Plaintiff's FOAA Complaint is a matter of public record; there was nothing to "disclose."

[8] Bridgett was a pre-trial detainee when she died and therefore her claim is more appropriately pleaded under the 14th Amendment. In an abundance of caution,

55.    The allegations above are realleged.

56.    This claim is brought against Defendants, LPN Cheryl Kirk; PA Edie Woodward, C/O Fred Rozzie, C/O Matthew Smith, and John and Jane Doe Prison and Medical STAFF 1-10 in their individual and official capacities. And Defendants Cumberland County Sheriff's Office, Cumberland County and Armor Correctional Health Services, Inc.

57.    Defendants LPN Cheryl Kirk; PA Edie Woodward, C/O Fred Rozzie, C/O Matthew Smith, and John and Jane Doe Prison and Medical STAFF 1-10 conducted and/or were aware of Bridgett's initial intake and screening. Each of them knew the nature of Bridgett's serious medical needs but acted with deliberate indifference, intentionally placing her in general population and ignoring her for 9 hours without any cognizable medical or administrative reason.

58.    Defendants' policy, entitled "**Medical supervised withdrawal and treatment,**" required defendants to "contact HCP" and begin Detox treatment in the infirmary or medically appropriate setting" for any detainee who the patient is determined to be experiencing withdrawal or is at high-

---

Plaintiff includes the 8th Amendment to the extent Defendants dispute Brigett's designation.

risk for severe withdrawal.[9] It further states, "Asymptomatic but chronic inebriates with a history of withdrawal syndromes should be referred to the clinician for detoxification treatment. And that "Patients who are admitted to the facility while undergoing methadone treatment, or who have chronic dependency on opioids, will be referred to the clinician."

59.    Defendants' policy states, "The medical staff will arrange for inmates identified as substance abusers to be detoxified. The Intake Supervisor will review the Intake Logs at least 3 times per shift to ensure the checks are being done physically."

60.    Defendants' policy provides for special "detox cells" where "The meaning of a cell check is the officer will physically walk to the cell(s) with the inmate(s) in it. That check will include but is not limited to respiratory status (breathing) and the inmate well-being. The 15 minute checks will be required whether the inmate is standing or lying down. If the inmate is on a suicide or psych watch or in the De-Tox cell(s), the log entries will include the inmate name, officer's name doing the check, date, and time. The status of the inmate i.e. sleeping, banging, eating etc. will be indicated on the clipboard outside the cell. If the inmate is not on any watch or in the De-Tox

_____

[9] Defendant's policy doesn't differentiate between "levels of withdraw," therefore any withdrawal should have resulted in detox treatment in infirmary or "medically appropriate setting."

cell, an entry similar to a housing unit is made, i.e. temporary housing secure. If the inmate appears to be sleeping and respiratory status (breathing snoring) cannot be determined, the officer will attempt to get a response from the inmate i.e. asking questions or banging on the cell door. If there is no response, the officer should immediately call the Supervisor. The officer may consider entering the cell and or calling a Medical Ellis. The camera is not to be used to check respiratory status (breathing) and well-being."

61. Defendants deliberately violated every directive in their policy, which Defendants knew was intended to save lives.

62. Prison records confirm that Bridgett was a known habitual opioid and illegal drug user and that she was under the influence of drugs upon her arrest.

63. Records further confirm that Bridgett was on "COWS" protocol. But despite this designation, Bridgett was assigned a cell in general population, that lacked heighted monitoring.

64. Video surveillance demonstrates that Defendants Rozzi and Smith causally walked past Bridgett's cell every 35 - 40 minutes without looking in, and without entering or otherwise doing anything to determine if Bridgett was alive and breathing. Less than one second elapsed each time they walked past Bridgett's cell.

65.    Photographic and autopsy evidence indicate that Bridgett was vomiting and dying hours before Defendant Rozzi finally opened her cell for breakfast.

66.    Defendants were seasoned employees and knew that withdraw symptoms peak between 24 and 48 hours after last use.

67.    Had Defendants cared to make sure Bridgett was breathing they could have provided life saving care. But Defendants collectively determined that Bridgett's life was not worth the effort.

68.    As a direct and proximate result of Defendants' unlawful actions and omissions, Bridgett suffered compensable damages including, but not limited to, physical pain and suffering, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to dignity and personal wellbeing, and other pecuniary and non-pecuniary losses.

## COUNT II

### Section 1983 Claim for Violation of the
### First Amendment Right of Access to the Courts

69.    The allegations above are realleged.

70.    Plaintiff brings this claim against Defenants Bolton and O'Brien in their individual capacity.

71.    Title 1, Section 401 of the Maine Revised Statutes Annotated, sets forth the intent of the Maine Legislature when it adopted the Freedom of Access Act.

72.    It is the intent of the Maine Legislature that actions of a governmental body, such as the Portland Police Department, Department of Corrections, Attorney General's Office and Cumberland County Sheriff's Department, be taken openly and that the records of their actions be open to public inspection and that their deliberations be conducted openly.

73.    "FOAA's central purpose [is to ensure] the public's right to hold the government accountable." *Blethen Me. Newspapers, Inc. v. State*, 2005 ME 56, ¶ 32, 871 A.2d 523. In furtherance of that purpose, FOAA "establishes a general right of the public to inspect and copy public records." *Doyle v. Town of Falmouth*, 2014 ME 151, ¶ 8, 106 A.3d 1145; *see* 1 M.R.S. § 408-A.

74.    By first unlawfully denying Plaintiff's FOAA demand and then agreeing to enter a joint order to produce, and then unilaterally rescinding her offer, Defendant, Jill O'Brien, denied Plaintiff access to the Court. As Bolton summarized, Plaintiff elected to refrain from filing another state court complaint because O'Brien agreed to produce the report via stipulated court Order.

75.    Worse, O'Brien's (and the DOC's) stated reason for this violation was expressly related to Plaintiff's civil rights claims against DOC staff. In other words, O'Brien admitted that she withheld the report to hinder Plaintiff's ability to further his Federal civil rights claim.

76.    Thus, O'Brien's actions prejudiced Plaintiff's state court claim and continue to prejudice Plaintiff's Federal civil rights claim.

77.    As stated above, this tactic of corresponding, delaying, and then rejecting information occurred previously when Mr. Toulan attempted to access police reports.

## Count III

## Section 1983 Claim for Civil Conspiracy

78.    The allegations above are realleged.

79.    This claim is brought against Defendants Jill O'Brien and Johnathon Bolton in their individual and official capacities.

80.    O'Brien and Bolton did act together and concert to conspire to withhold the attorney general's report on Bridgett's death and investigation.

81.    Bolton's email confirms that he spoke to O'Brien and that he "therefore also" withheld the report that was apparently possessed by both agencies.

82.    They withheld the report because it undoubtably enables

Plaintiff's civil rights claim for deliberate indifference.

83.    As a direct result of Defendants' actions, Plaintiff cannot use the AG's report to support his claim and his claims have been delayed to his detriment.

## Prayer for Relief

84.    Mr. Toulan requests relief against Defendants as follows:

a.    Declare that Defendants violated Bridgett Toulan's civil rights under 42 U.S.C. § 1983 to be free from cruel and unusual punishment and from unlawful interference with Mr. Toulan's fundamental rights of access to the courts, freedom of speech and expression.

b.    Award compensatory damages in amounts to be determined at trial by the jury;

c.    Award punitive damages in amounts to be determined at trial by the jury;

d.    Award Mr. Toulan full expenses and reasonable attorney's fees;

e.    Award Mr. Toulan prejudgment interest;

f.    Direct Defendants to produce all records including the Attorney General's Report; and

f.    Award such further relief as is deemed appropriate.

Respectfully submitted,


*/s/ Joseph P. Guzzardo*
Joseph P. Guzzardo
Romanow Law Group
1027 Forest Ave
Portland, ME
Joseph@romanowlawgroup.com
207-331-9990